**In re STERLING OPTICAL CORP., Debtor.**

**Sterling Vision, Inc., Plaintiff,**

**v.**

**Sterling Optical Corp. and Fleet Business Credit Corporation, Defendants.**

Bankruptcy No. 91–15944 (REG).
Adversary No. 95–8043.

United States Bankruptcy Court,
S.D. New York.

Aug. 13, 2003.

Angel & Frankel, P.C., by Bruce Frankel, Leonard H. Gerson, New York City, for Sterling Vision, Inc.

Cory E. Friedman, by Cory E. Friedman, New York City, for Fleet Business Credit Corporation.

### DECISION AND ORDER ON SUBJECT MATTER JURISDICTION

ROBERT E. GERBER, Bankruptcy Judge.

In this adversary proceeding under the umbrella of a case under chapter 11 of the Bankruptcy Code—seeking a determination as to the entitlement to receivables that are asserted to have been property of the debtor that was sold incident to a Bankruptcy Code section 363 sale in the umbrella chapter 11 case—defendant Fleet Business Credit Corp. ("Fleet") moves, pursuant to Fed.R.Civ.P. 12(b)(1) and (h), made applicable to adversary proceedings

under Fed. R. Bankr.P. 7012(b), to dismiss for lack of subject matter jurisdiction.[1] As the Court determines that at the time the complaint was filed, it had subject matter jurisdiction under each of the "arising under," "arising in" and "related to" prongs of the relevant jurisdictional statute, 28 U.S.C. § 1334 ("Section 1334"), the motion is denied.

### Facts

While the ultimate matters to be determined (as to whether the receivables in question were property of the debtor and conveyed in the section 363 sale) are of course hotly disputed, the facts relevant to this determination—principally those defining the nature of the controversy to be determined and the historic facts in connection with the parties' dispute—are not.

### Background

Plaintiff Sterling Vision, Inc ("Vision")—not to be confused with the debtor Sterling Optical Corp. ("Optical")—brought this adversary proceeding against defendants Fleet, as the successor to Sanwa Business Credit Corp. ("Sanwa," referred to in the Complaint as "SBCC"),[2] and Optical. Vision,[3] which purchased the business of Optical in a section 363 sale in Optical's chapter 11 case, seeks a declaratory judgment that property of the Optical estate—part of the assets Vision had so purchased from Optical—included the receivables associated with certain "Franchisee Notes," originally payable to Optical by franchisees op-

---

1. Noting that deficiencies in subject matter jurisdiction can never be waived, and contending that a motion is unnecessary, Fleet denominates its submission as a "Suggestion" that the Court lacks subject matter jurisdiction. The Court has no need to focus on such a distinction. Parties seek orders in litigation by motions. So as not to strain the discussion, the Court will treat Fleet's filing like any other under which an issue is brought before the Court, and refer to this matter as a "motion."

2. The relevant underlying documents refer to Sanwa, the business entity with which Optical and Vision dealt at the time, while the motion papers now refer to Fleet, Sanwa's apparent acquirer and/or successor. To minimize confusion, the Court will hereafter refer to them as "Sanwa."

3. Plaintiff Vision was then known as "Sterling Acquisition, Inc." (Cmplt. ¶ 11), but that does not appear to be material to this dispute.

erating vision centers, to which Sanwa was asserting a competing claim.[4]

Sanwa advanced funds to Optical, pursuant to a letter agreement between Sanwa and Optical dated as of November 29, 1990, as thereafter amended (as amended, the "Sanwa Letter Agreement"), and depending on one's point of view, either made a secured loan to Optical, secured by the Franchisee Notes receivables (in which case Sanwa would be entitled to repayment of its loan, interest and authorized fees, but no more than that) or bought the Franchisee Notes outright for the amount it advanced (in which case it would be entitled to everything realized on the Franchisee Notes—even if, as is apparently the case, the amount Sanwa realized on the Franchisee Notes substantially exceeded the amount Fleet advanced).[5] Which point of view should be taken is the under-

lying issue in the controversy. As is apparent from the foregoing, while Optical, the seller-counter-party in the section 363 sale to Vision, was the original entity which would have the competing claim to the excess receivables, Optical's business was sold to Vision, and with it, any rights Optical had. This litigation is now a litigation between the two entities asserting a claim to the Franchisee Notes, Vision and Sanwa.

Debtor Optical filed a voluntary petition under chapter 11 of the Code on December 31, 1991. Optical's financial condition was such that it did not have the luxury of disposing of its business under a chapter 11 plan, and as a result, its business was sold in a section 363 sale in the early months of the Optical chapter 11 case. The section 363 sale was effected pursuant to an Asset Purchase Agreement, dated

---

**4.** As described by counsel for Vision (in remarks that were not disputed by Sanwa), Optical opened up stores for franchisees. It financed the construction of the stores, and took back notes from the franchisees, initially payable to Optical. Optical then went to Sanwa, pledging those notes, and (here the Court is modifying the assertion to state it in a more neutral way), obtained money from Sanwa on the strength of those notes. Tr. of Hrg. of Jan. 12, 2000, at 8, before Bernstein, C.J.

**5.** Counsel for Vision stated at that hearing:

Sanwa contends, and that is what this case is about, that they have outright ownership in the notes. That if Sterling Optical, for example, borrowed a million dollars and gave the notes as collateral for the payment of the million dollars, and the notes, say, have a face value of $2 million, once the million dollars is collected by Sanwa, we claim, as did Sterling Optical[,] that the residual value, the remaining balance to be paid of $1 million under this scenario[,] would go to Sterling Optical and now to my client.

Tr. of Hrg. of Jan. 12, 2000 at 8 (transcription errors corrected). Counsel for Sanwa then went on to say that the transaction was documented as an "outright sale" (*id.* at 9), but

there were also, as he acknowledged, "certain repurchase rights" (*id.*), and it is at least possible that there were other economic characteristics of the transaction that might be relevant. Under applicable law, words used by parties in their documents are not necessarily conclusive, and conclusions may rest on the economics of a transaction, as contrasted to the words used by the parties, or even their stated intent. *See, e.g., In re PSINet,* 271 B.R. 1, 43 (Bankr.S.D.N.Y.2001) (Gerber, J.) (under UCC, language in equipment lease created, as a matter of law, a secured financing, by reason of transaction economics).

As ostensible "sales" may be recharacterized when they are secured financings, *see, e.g., Major's Furniture Mart, Inc. v. Castle Credit Corp.,* 602 F.2d 538, 546 (3d Cir.1979) (true nature of accounts receivable "sale" transaction was a secured loan, not a sale), the parties have diametrically different views in this regard. The appropriate characterization of transactions like this is a matter of frequent controversy in the bankruptcy courts. *See, e.g., In re Bevill, Bresler & Schulman Asset Mgt. Corp.,* 67 B.R. 557, 584–585 (D.N.J.1986) (Debevoise, J.); *In re LTV Steel Co.,* 274 B.R. 278, 285–286 (Bankr.N.D.Ohio.2001) (Bodoh, J.); Issues of this character, and/or variants of it, are referred to as "True Sale" issues.

February 28, 1992 (the "Asset Purchase Agreement"), for a sale of substantially all of the assets of Optical. After Vision submitted the highest and best bid at an auction, Vision was found by this Court's predecessor, Hon. James L. Garrity, to have been the successful bidder. Judge Garrity approved the sale to Vision by an order also dated February 28, 1992 (the "Sale Approval Order"), under, *inter alia*, section 363.

Under the Asset Purchase Agreement, included in the assets acquired by Vision were "all of Seller's [*i.e.*, Optical's] rights with respect to all franchise notes, including Franchisee Notes that have been pledged (or 'sold') in connection with the Bank Debt...." Asset Purchase Agreement Section 1(a)(x). It is undisputed that the "Bank Debt" refers to debt to Sanwa. In other words, if Optical had the rights in those notes, it conveyed them to Vision, but whether or not Optical had any such rights remains a matter of debate between Vision and Sanwa.

Vision contends that although as of the date of filing of Optical's chapter 11 petition, Sanwa had not yet been repaid, the amount outstanding on the Franchisee Notes was more than sufficient to pay Sanwa in full, with interest, and that after the commencement of this adversary proceeding, Sanwa received the full return on its investment, with interest, and much more. The "much more" that is asserted to have been paid to Sanwa represents the residual value of the Franchisee Notes, which, according to Vision, belongs to Optical, and which was part of the assets Vision purchased under the Asset Purchase Agreement and Sale Approval Order.

Upon Optical's motion for approval of the 363 sale of its assets to Vision, Vision asserted, consistent with its position now, that the Franchisee Notes were assets of Optical, subject to sale. But Sanwa asserted that the Franchisee Notes belonged to it, not Optical, and that Optical could not sell what it did not own and had no interest in. At the hearing on the motion, Fleet sought clarification that the Franchisee Notes could be sold by Optical only to the extent that Optical had any interest in them. Apparently all parties agreed that this was the case, but whether or not Optical then had an interest in them was not judicially determined at that hearing, and the matter was left for another day. Now that the "other day" has come, Sanwa contends that that this Court lacks the subject matter jurisdiction to make the determination the Court then deferred—a position that, if upheld, would effectively give Sanwa unchallenged ownership of the Franchisee Notes.

*The Asset Purchase Agreement and Sale Order*

The Asset Purchase Agreement was incorporated by reference into the Sale Order. It provided, in relevant part:

> Subject to the terms and conditions hereof, on the Closing Date ... Seller [Optical] will sell, convey, transfer and deliver to Buyer [Vision], and Buyer will purchase from Seller, the Business, free and clear of Encumbrances (as defined below) and claims ... including, without limitation, the following (collectively, the "Acquired Assets"):
>
> ...
>
> (x) all of Seller's rights with respect to all franchisee notes, including franchisee notes that have been pledged (or "sold") in connection with the Bank Debt (as defined below)....

Asset Purchase Agreement Section 1(a).

The Asset Purchase Agreement further provided:

> Buyer is hereby authorized to negotiate with each of CIT, Sanwa and GECC (collectively, the "Lenders") with respect to restructuring the terms of Seller's

outstanding indebtedness to each of the Lenders which is secured by notes payable to Seller issued by Seller's franchisees (such indebtedness, other than Seller's indebtedness to CIT with respect to equipment leases, being hereinafter referred to as the "Bank Debt"). Buyer shall use reasonable efforts to convince the Lenders to release their claims against Seller prior to or on the Closing Date, but Buyer shall have no obligation to assume any of the Bank Debt. Buyer hereby acknowledges that the provisions of this Section 1(i) shall not authorize Buyer to enter into any binding arrangements with the Lenders on Seller's behalf without Seller's express written consent.

Asset Purchase Agreement Section 1(i). It continued, in that same lengthy paragraph:

> *For all purposes of this Agreement, the Bank Debt shall be deemed to be secured indebtedness of Seller* and the franchise notes "sold" to the Lenders pursuant to the agreements evidencing the Bank Debt *shall be treated as assets of Seller (and thus to be transferred to Buyer as part of the Acquired Assets) pledged to secure such Bank Debt,* notwithstanding the fact that in certain cases such agreements purport to involve a sale of assets to the Lenders. *The Acquired Assets include Seller's rights with respect to the franchisee notes referred to in Section 1(a)(x).* Buyer agrees that the franchisee notes and other assets included in the Acquired Assets that are collateral for (or were "sold" in connection with) the Bank Debt shall remain subject to the liens and claims of the Lenders arising under the agreements evidencing the Bank Debt.

*Id.* (emphasis added).

The language of the Asset Purchase Agreement is clear that, as between Optical and Vision, the understanding was that the Franchisee Notes to be sold to Vision were receivables of the Optical estate, subject to a security interest in favor of Sanwa (that would have to be satisfied, and as to which the Franchisee Notes would remain subject). But this understanding would not be binding upon Sanwa until and unless a court made an appropriate determination, before which Sanwa would have notice and opportunity to be heard, as to the correctness of that understanding.

As noted, Sanwa contended, at the time, that Optical lacked the interest in the Sanwa notes receivable to sell, and presumably as a consequence of a Sanwa request, the Sale Order included a reservation of rights. The Sale Order provided, in one of its many decretal paragraphs, in relevant part:

> ORDERED, that nothing contained in the Asset Purchase Agreement, including without limitation, paragraph 1(i) thereof, shall prejudice the Lenders' (as defined in the Asset Purchase Agreement) or the Debtor's rights with respect to characterizing the transactions which gave rise to the Bank Debt (as defined in the Asset Purchase Agreement) as a sale or as a loan or otherwise and any provision of the Asset Purchase Agreement which purports to so characterize the Bank Debt shall not be binding on the Lenders or the Debtor....

Sale Order at 16. In short, rather than determining, in connection with the sale at that time, the rights of Optical (and hence Vision) and Sanwa, the issue of that characterization was left for another day.

*Sanwa's Proof of Claim*

On September 21, 1992—before this adversary proceeding was filed—Sanwa filed a proof of claim in Optical's chapter 11 case. Sanwa's Proof of Claim sought payment in the amount of $2,310,986.77 as a secured claim, based on the Sanwa Letter Agreement, "[f]iled UCC financing statements," and "certain promissory notes."

With substantially all of Optical's assets having been sold in the 363 sale, Optical's chapter 11 case was essentially a liquidation case for the benefit of its creditors, and the Creditors' Committee in that case took the laboring oar in putting forward a liquidating plan of reorganization and examining and objecting to claims. On December 9, 1994—also before this adversary proceeding was filed—the Creditors Committee objected to the allowance of the Sanwa Proof of Claim. The Creditors Committee stated:

> Although Sanwa's Proof of Claim does not adequately describe the nature of the Debtor's obligation to Sanwa, the Debtor believes such obligations are based upon indebtedness to Sanwa secured by promissory notes payable to the Debtor (the "Franchisee Notes") issued by certain of the Debtor's franchisee's which were conveyed to [the predecessor to Vision] pursuant to Section 1(i) of the Asset Purchase Agreement.

Creditors' Comm. Obj. ¶ 4. The Creditors' Committee further expressed the view that Optical was contingently liable to Sanwa to the extent that the collateral securing the Franchisee Notes were insufficient to pay the Sanwa claim (*id.* ¶ 5)—which, if true, would support the view that Sanwa was a secured creditor, for whom the Franchisee Notes were collateral, and not the purchaser of the Franchisee Notes in a "True Sale."

The Creditors' Committee further noted in its objection that under the Asset Purchase Agreement, the Franchisee Notes, as well as the underlying collateral, were conveyed to Vision, "subject to the liens and claims of Sanwa" (*id.* ¶ 6), and that the value of the collateral securing the Franchisee Notes exceeded the amount of Sanwa's claim (*id.* ¶ 7)—thereby requiring the disallowance of that claim.

On or about February 2, 1995 (after this adversary proceeding was commenced), Sanwa filed a response to the Creditors' Committee objection. In its response, Sanwa stated:

> Pursuant to paragraph 12(c) of the [Sanwa Loan Agreement] as amended in August of 1991, any surplus in the residual value of the [Franchisee Notes] would be paid *to the Debtor*.

Response ¶ 2 (emphasis added).[6] Sanwa further stated that if a reserve to be created to secure Optical's obligations to Sanwa was insufficient to cover any shortfall on

---

**6.** In its reply, Sanwa stated, with respect to this:

> Plaintiff Vision has not even properly filed its version of the facts. For example, Exhibit B to Vision's Brief, as filed on the Court's ECF server and served upon counsel for Fleet, does not include the page Plaintiff Vision purports to rely on.

Sanwa Reply ¶ 3, n. 2. It is true that the relevant page was missing from that exhibit. But the implication from that—that Sanwa had not said what Vision said it did—was false.

The Court's independent review of papers submitted to it in the Optical chapter 11 case confirms that Sanwa did indeed say what Vision attributes to Sanwa. The relevant paragraph, in its entirety, reads:

> Paragraph 12 of the Agreement provides that an interest bearing reserve would be established to secure all of the Debtor's obligations and liabilities to Sanwa. This reserve would cover any shortfall on collection of the Notes. If the reserve was insufficient to cover any shortfall, the Debtor was liable for the shortfall. Pursuant to the Paragraph 12(c) of the Agreement as amended in August of 1991 any surplus in the residual value of the Notes would be paid to the Debtor. The Agreement is unquestionably executory. Neither side has fully performed. *In re Child World, Inc.,* 147 B.R. 847, 851–52 (Bankr.S.D.N.Y. 1992); *In re Raymond,* 129 B.R. 354, 357–58 (Bankr.S.D.N.Y.1991).

Opposition of Sanwa Business Credit Corporation to the Objection to Its Proof of Claim and Request for a Hearing, dated Feb. 2, 1995, ¶ 2.

The Court notes, for the benefit of the Bar, that even in an adversarial litigation process,

the collection of the Franchisee Notes, Optical would be liable for the shortfall. (*Id.*) [7]

Vision commenced this adversary proceeding on January 9, 1995.[8] Vision's complaint raised issues at least in material part identical to those that had been raised, and joined, by Sanwa's proof of claim, and the Creditors' Committee's objection thereto.

Thus, when the adversary proceeding was commenced, the Court had before it:

(1) a pending proof of claim by Sanwa, asserting a secured claim in excess of $2.3 million, under the agreement in controversy here;

(2) a pending objection to that proof of claim; and

(3) the issues as to (a) whether Sanwa's claim was secured by the Franchisee Notes; (b) whether, as Sanwa had stated in its response to the Creditors' Committee's objection to the Sanwa claim, "any surplus in the residual value of the Notes would be paid to the Debtor"; and (c) expressly or impliedly,

whether the residual value in the Franchisee Notes was property of the Optical estate which could be, and was, conveyed to Vision.

On June 22, 1995, a hearing was held before Judge Garrity, at which he indicated that he "would entertain all issues regarding the asset purchase agreement previously approved by the Court," and "[a]ll disputes would be resolved in the Bankruptcy Court." [9] On January 9, 1997, at a hearing before Judge Garrity dealing with the Creditors' Committee's objection to Sanwa's claim and this adversary proceeding, Judge Garrity set a discovery schedule which was without prejudice to the Optical estate's right to commence an estimation hearing to deal with any distribution which might have to be made on account of Sanwa's claim.[10] At the time of a further pretrial hearing, on April 30, 1997, at which Judge Garrity was advised that Vision, together with the Creditors' Committee, would be pursuing discovery, Vision was advised that Sanwa waived distribution on its filed claims.[11]

---

half-truths are not acceptable to this Court. The Court expects greater candor from Sanwa in the future proceedings in this case.

7. Vision contends that Sanwa's filing of a secured claim, references to the UCC financing statements and promissory notes, and Sanwa's contention that it could recover on a deficiency all support Vision's position, as being indicative of the secured financing that Vision contends took place, rather than the sale that Sanwa contends took place. The Court fully understands Vision's point, but this goes to the merits, and not to subject matter jurisdiction. In light of the Court's disposition of the subject matter issue, discussed below, Vision will be free to expand on the point, and Sanwa will have an opportunity to respond to it, in further proceedings. By contrast, the implications of Sanwa's having filed the proof of claim, as to which the Optical estate had an objection pending, at the time Vision filed the adversary complaint, are highly relevant to the issue of subject matter jurisdiction, as discussed below.

8. *See* Transcript of Bancap Docket (ECF # 18) & its Attachment 1 (Complaint).

9. Frankel Aff. ¶ 17 (Oct. 16, 2001).

10. *Id.* ¶ 20.

11. *Id.* ¶ 21. From time to time, this Court was advised that Sanwa "withdrew" its claim. At oral argument on this motion, counsel for Sanwa stated that it was not withdrawn. He continued:

[I]t was not withdrawn but according to the Order, we have the right to withdraw it at our sole discretion any time we want.

So I guess if the claim is some kind of basis for jurisdiction, we will withdraw it because the Court has already ordered that we have the right to do it any time.

(Arg. Tr. at 34–35). Since, as noted below, subject matter jurisdiction is measured as of the time of the filing of the complaint, and the subsequent unilateral acts of a litigant cannot take it away, neither the waiver of distribu-

*Commencement of Adversary Proceeding*

As previously noted, on January 9, 1995, this adversary proceeding was commenced.[12] In its complaint, Vision sought a declaratory judgment that (much as Sanwa had contended in its proof of claim), Sanwa was a secured creditor of the Optical estate, having a lien on the receivables that were the Franchisee Notes, as compared and contrasted to an ownership interest in the Franchisee Notes as a consequence of an alleged true sale. Thus Vision further sought a determination, as part of its desired declaratory judgment, that it succeeded to ownership of the Franchisee Notes by reason of its purchase of assets under the Asset Purchase Agreement and the order approving the transaction, subject to the satisfaction of the outstanding obligations to Sanwa. (*See* Cmplt. ¶ 24).

As a result, Vision alleges that it is entitled to the residual value of the Franchisee Notes. (*Id.*). In that connection, Vision also seeks a declaration that, whether or not Sanwa is correct in an assertion Sanwa had made that the Sanwa Letter Agreement was an executory contract (within the meaning of Bankruptcy Code section 365) that had not been assumed by Optical (*see* Cmplt. ¶ 28), Sanwa nevertheless could not be paid, as a secured creditor, more than it was owed on account of its collateral interest in the Franchisee

Notes (*see id.* ¶ 29)—and that as the successor to Optical's interest, Vision was entitled to the Franchisee Notes, subject to Sanwa's interests as a secured creditor. (*Id.* ¶¶ 30–31). With respect to both of these claims, Vision also seeks an accounting.

On September 9, 1999 a final decree was signed in Optical's underlying chapter 11 case. As is apparent from the chronology, that final decree had not been entered as of the January 1995 commencement of the adversary proceeding.

*Discussion*

*I.*

Section 1334 of the Judicial Code, 28 U.S.C. § 1334, defines the subject matter of the district courts (and hence the bankruptcy courts) with respect to the exercise of their bankruptcy jurisdiction. After providing, in its subsection (a), that the district courts have jurisdiction (and, indeed, exclusive jurisdiction) over *cases* under title 11 (a matter not relevant here), it provides, in relevant part, with respect to *proceedings* (which include, in addition to contested matters in cases, adversary proceedings like this one):

(b) Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdic-

---

tions on the proof of claim nor its withdrawal would be effectual to divest the Court of any subject matter jurisdiction it would otherwise have. The Court also notes that Fed. R. Bankr.P. 3006, relating to the withdrawal of claims, provides that where, as here, an objection to the claim has been filed, an order of the Court authorizing the withdrawal is required, and the "order of the court shall contain such terms and conditions as the court deems proper." *See also* 9 *Collier* ¶ 3006.01 at page 3006–6 ("The order allowing withdrawal of a claim may include such provisions as the court deems appropriate. Thus, withdrawal might be conditioned upon reten-

tion of jurisdiction over an adversary proceeding"). For those reasons, any distinctions between Sanwa's withdrawal of its claim and Sanwa's waiving distributions under it are immaterial for the purposes of this motion.

12. For a variety of reasons, as to which the Court declines to put blame at the feet of any single party, and which also include changeovers in the responsible judge, this proceeding has moved at a pace markedly slower than the bulk of the adversary proceedings before this Court.

tion of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

28 U.S.C. § 1334(b). The three types of jurisdiction that district (and hence bankruptcy) courts thus may exercise are "arising under" and "arising in" jurisdiction (which the Court regards as species of federal question jurisdiction), and "related to" jurisdiction. Here the Court believes that it has subject matter jurisdiction under all three of these bases.

## A.

### "Arising Under" Jurisdiction

■ "Arising under" jurisdiction relates to federal question claims of a particular type—those federal questions that have their origin in title 11 of the United States Code—*i.e.*, the Bankruptcy Code—and rest on provisions of title 11. "Arising under" jurisdiction relates to those matters where relief is sought based upon a right created by title 11. *See, e.g., Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987); *National City Bank v. Coopers and Lybrand (In re Wickes)*, 802 F.2d 990, 994 (8th Cir.1986); *In re Riverside Nursing Home*, 144 B.R. 951, 955 (S.D.N.Y. 1992) (Broderick, J.).

■ Claims of this type rest on provisions of the Bankruptcy Code, or require construction of the Code for their determination. Significantly, for purposes here, they include the consideration of claims against the estate, which indeed is a core matter, which a bankruptcy judge, and not just a district judge, can decide.

### "Arising In" Jurisdiction

■ A claim "arises in" bankruptcy if, by its very nature, the claim can only be brought in a bankruptcy action, because it has no existence outside of bankruptcy. *See Riverside Nursing Home*, 144 B.R. at 955; *176–60 Union Turnpike v. Howard Beach Fitness Center*, 209 B.R. 307, 311, n.

2 (S.D.N.Y.1997) (Sprizzo, J.). Matters involving the enforcement or construction of a bankruptcy court order are in this category.

### "Relating To" Jurisdiction

■ "Relating to" jurisdiction relates to those matters that are not in the first two categories that nevertheless relate to a bankruptcy case. The principles underlying "related to" subject matter jurisdiction determinations were discussed at some length in this Court's decisions in *ML Media Partners, LP v. Century/ML Cable Venture (In re Adelphia Communications Corp.)*, 285 B.R. 127, 136–137 (Bankr. S.D.N.Y.2002) *("Adelphia")*, and *Blackacre Bridge Capital, LLC v. Korff (In re River Center Holdings, LLC)*, 288 B.R. 59 (Bankr.S.D.N.Y.2003), and will not be repeated at length here. As Chief Judge Mukasey of the district court noted when considering an earlier "related to" issue under section 1334(b), the Third Circuit has articulated what has become the prevailing definition of "related to" jurisdiction:

> [A] civil proceeding is related to bankruptcy [if] … *the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.* Thus, the proceeding need not necessarily be against the debtor or the debtor's property. An action is related to the bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.

*Weisman v. Southeast Hotel Props. Ltd. P'ship*, 1992 WL 131080, at *3 (S.D.N.Y. 1992) (Mukasey, C.J.) (emphasis in original) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir.1984), and finding subject matter jurisdiction to exist)

("*Weisman*"); accord *Hunnicutt Co. v. TJX Companies, Inc. (In re Ames Dep't Stores, Inc.),* 190 B.R. 157, 160 (S.D.N.Y. 1995) (Koeltl, J.) (also finding subject matter jurisdiction to exist) ("*Hunnicutt*"). This test is often referred to as the "conceivable effects" test, or the "*Pacor* test." *See Adelphia,* 285 B.R. at 136–137 (discussing this matter in greater detail).

■ As noted at greater length in *Adelphia, see id.* at 137, it now is clear that in the Second Circuit, as elsewhere, the *Pacor* test is utilized, and the existence of a "conceivable effect" on the bankruptcy estate now establishes "related to" jurisdiction under section 1334(b). *See In re Cuyahoga Equipment Corp.,* 980 F.2d 110 (2d Cir.1992) ("*Cuyahoga Equipment*"); *Back v. LTV Corp. (In re Chateaugay Corp.),* 213 B.R. 633, 638 (S.D.N.Y.1997) (Baer, J.); *Bond St. Assocs., Ltd. v. Ames Dep't Stores, Inc.,* 174 B.R. 28, 32 (S.D.N.Y.1994) (McKenna, J.); *Masterwear Corp. v. Rubin Baum Levin Constant & Friedman (In re Masterwear Corp.),* 241 B.R. 511, 515 (Bankr.S.D.N.Y. 1999) (Bernstein, C.J.) ("*Masterwear*").

### B.

■ In determining this motion, several subject matter jurisdiction principles are also of relevance here. First, the existence or absence of subject matter jurisdiction is determined at the time of the filing of the complaint. *See Rosa v. RTC,* 938 F.2d 383, 392 n. 12 (3d Cir.1991) ("It is a firmly established rule that subject matter jurisdiction is tested as of the time of the filing of the complaint"). Secondly, events occurring after the institution of suit "do not oust jurisdiction." *St. Paul Mercury Indemnity Co. v. Red Cab. Co.,* 303 U.S. 283, 289–290, 58 S.Ct. 586, 82 L.Ed. 845 (1938) ("*St. Paul*"). *See also United States Fidelity & Guaranty Co. v. The Millers Mutual Fire Insurance Co.,* 396 F.2d 569, 571 (8th Cir.1968) ("Defendant overlooks in its present jurisdictional

attack the well settled principle that once jurisdiction is successfully invoked, subsequent events are of no importance and cannot divest the court of its jurisdiction"); *Wolde–Meskel v. Vocational Instruction Project Community Services, Inc.,* 166 F.3d 59, 62 (2d Cir.1999) (in diversity context, noting that requirements for subject matter jurisdiction are determined as of the date that suit is filed). A corollary, and important consequence of that, is that the volitional acts of one litigant cannot divest the court of subject matter jurisdiction once it has it. *See Smith v. Sperling,* 354 U.S. 91, 77 S.Ct. 1112, 1 L.Ed.2d 1205 (1957) (In the context of diversity, "jurisdiction, once attached, is not impaired by a party's later change of domicile," citing *Mollan v. Torrance,* 22 U.S. 537, 9 Wheat. 537, 6 L.Ed. 154 (1824)); *Gaddis v. Wyman,* 304 F.Supp. 713, 715 (S.D.N.Y.1969) ("Voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case ..." quoting *United States v. W.T. Grant,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)); *In re Peoples,* 296 N.C. 109, 250 S.E.2d 890, 911 (1978) ("Jurisdiction is not a light bulb which can be turned off or on during the course of the trial. Once a court acquires jurisdiction over an action it retains jurisdiction over that action throughout the proceeding.... If the converse of this were true, it would be within the power of the defendant to preserve or destroy jurisdiction of the court at his own whim," quoting *Silver Surprize, Inc. v. Sunshine Mining Co.,* 74 Wash.2d 519, 445 P.2d 334, 336–337 (1968)).

Those principles apply in bankruptcy cases as well. As noted in *In re Hutchins,* 145 B.R. 119 (Bankr.D.R.I.1992) (Votolato, J.), in denying a motion to dismiss for an asserted lack of subject matter jurisdiction:

> [W]e adhere to the well established principle that "jurisdiction is determined at

the time the suit is filed and after vesting, cannot be ousted by subsequent events, including action by the parties." *Id.* at 122 (internal citations omitted).

## II.

 When the Court considers the circumstances at the time Vision's complaint was filed, it is plain that this Court has subject matter jurisdiction, and, indeed, that it has such jurisdiction under each of the three prongs of 28 U.S.C. § 1334(b). The Court could approach this by discussing the various prongs separately, or alternatively on the grounds that would trigger jurisdiction under one or more of those various prongs; it believes that organizing the discussion on the latter basis makes more sense.

### A.

At that time the adversary proceeding was commenced, in January 1995, Sanwa had filed a proof of claim with the bankruptcy court.[13] When it did so, Sanwa put directly at issue before the bankruptcy court the nature of its claimed interest in the Franchisee Notes—with a nexus to the claims allowance process even closer than that associated with the submission to bankruptcy court jurisdiction that results from the filing of a proof of claim generally. Sanwa's proof of claim had been objected to by Optical's Creditors' Committee, also before the filing of the adversary complaint,[14] and issue had been joined in that respect. The matters raised by the proof of claim, and the objection thereto, substantially, if not totally, overlapped with the issues for determination here.

 When Sanwa filed a proof of claim in the bankruptcy court, it submitted to the equitable jurisdiction of this Court, especially with respect to the very subject matter of its claim. *See Katchen v. Lan-*

*dy,* 382 U.S. 323, 329, 86 S.Ct. 467, 472, 15 L.Ed.2d 391 (1966); *Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 58–59 & n. 14, 109 S.Ct. 2782, 2799–2800 & n. 14, 106 L.Ed.2d 26 (1989); *Langenkamp v. Culp,* 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990). Additionally, Sanwa thereby triggered the claims allowance process. As the Supreme Court noted in *Langenkamp:*

In *Granfinanciera* we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of "allowance and disallowance of claims," thereby subjecting himself to the bankruptcy court's equitable power.

*Langenkamp,* 498 U.S. at 44, 111 S.Ct. at 331.

 Sanwa understandably does not argue that the submission to bankruptcy court jurisdiction that results from the filing of a proof of claim is limited to the adjudication of the claim itself. And the Court disagrees with Sanwa's contention that the cases provide for a submission to bankruptcy court jurisdiction only with respect to actions or counterclaims filed by a trustee. Rather, the cases consistently speak of submission to the jurisdiction of the *bankruptcy court,* rather than to the claims of a particular plaintiff or prospective plaintiff. Indeed, as the Supreme Court noted in *Katchen* (which was decided under the now-superseded Bankruptcy Act, but which has continued to be cited with respect to the submission to bankruptcy court jurisdiction that results from the filing of a proof of claim), with respect to the bankruptcy court's power to allow or disallow claims, after the filing of a proof of claim:

This power to allow or to disallow claims includes "full power to inquire into the validity of any alleged debt or obligation

---

**13.** The proof of claim had been filed on September 21, 1992.

**14.** The Creditors' Committee objection had been filed on December 9, 1994.

upon which a demand or a claim against the estate is based."

*Katchen,* 382 U.S. at 329, 86 S.Ct. at 472.

The teaching of *Katchen* is that there is a resulting submission to the summary jurisdiction of the bankruptcy court as a consequence of the filing of a proof of claim—eliminating the need to bring a plenary action elsewhere—and not just a submission to procedural mechanisms that might be utilized in the bankruptcy court.[15] Thus this Court likewise disagrees with Sanwa's contention that *Katchen* and its progeny "only deal with jury trial rights, not jurisdiction."

As in *Katchen,* having filed a claim, Sanwa subjected itself to the bankruptcy court's equitable power—triggering the claims allowance process, which involves matters arising under title 11, and arising in proceedings under title 11. These are two of the three bases for jurisdiction under section 1334(b).

Indeed, after Sanwa filed its proof of claim, the issues that now are before the Court became core matters that a bankruptcy judge, and not just a district judge,

can decide. See *In re Petrie Retail, Inc.,* 304 F.3d 223 (2d Cir.2002). In *Petrie Retail,* the Second Circuit held that a dispute between two non-debtors—one the purchaser of a lease in a bankruptcy sale, and the other the landlord—was a core matter. The non-debtors were litigating over the ability of the landlord to seek post-petition rents from the purchaser with respect to a time period preceding the sale; the rents were "excluded liabilities" under the sale order. The purchaser sought entry of an order of the bankruptcy court enforcing the sale order's injunction as to excluded liabilities, and finding the landlord in violation of the confirmation order for seeking to collect excluded liabilities. See *id.* at 227. The bankruptcy court determined that it had jurisdiction to enforce the pre-existing injunction as stated in the sale order, and to interpret the lease in the context of the landlord's administrative claim against the debtors and its claim against the purchaser for excluded liabilities. *Id.* Its decision was affirmed by the district court and, ultimately, the Second Circuit.[16]

One of the three factors[17] resulting in

---

**15.** Thus *Germain v. Connecticut National Bank,* 988 F.2d 1323 (2d Cir.1993) does not help Sanwa. While it is of course true, as the Second Circuit there noted, that the jury trial aspects in *Katchen* and its progeny turn "not so much on a theory of waiver as on the theory that the legal issue has been converted to an issue of equity," *see id.* at 1329, those cases, particularly *Katchen,* have broader significance. *Katchen* relieved the trustee from the need to bring the plenary action then required under the former Bankruptcy Act, holding that after the target had filed a proof of claim, the bankruptcy court could consider the claim under its summary jurisdiction. *See* 382 U.S. at 334–335, 86 S.Ct. 467.

**16.** *Petrie Retail* was a 2–1 decision, but of course is still binding on this Court. The Court notes that Judge Jacobs, dissenting, found the majority decision troublesome in material part because the rent obligation in question was a *post*-confirmation obligation.

*See id* at 233. He observed that "Jurisdiction over the landlord's claim concerning the *pre*-confirmation rent owed by the *Debtor* is undoubted." *Id.* (emphasis in original). The latter is of course what was before this Court when Vision filed its adversary complaint. Thus it is reasonable to believe that all three of the judges on the *Petrie Retail* panel would be comfortable with the result this Court reaches here.

**17.** The Second Circuit noted, in this connection, that it was expressing no view as to whether any one of the factors, by itself, would render the proceeding core. *See id.* at 231. Nevertheless, on the facts presented here, and particularly the huge congruence between the Sanwa claim and the issues Vision raised, this Court believes that the claims allowance process factor by itself supports subject matter jurisdiction here.

Without specifically addressing any reasons for doing so, the *Petrie Retail* court dis-

the conclusion that the dispute involved a core matter [18] was the landlord's submission of a claim—there a post-petition administrative expense claim—against the estate. The dispute presented a core matter because the dispute between the landlord and the purchaser involved an issue "already before the bankruptcy court as part of its consideration of the landlord's claim against the estate." *See id.* at 230. It was the administrative proof of claim for additional rent from the estate, over which the bankruptcy court had core jurisdiction. *Id.* As such, "the dispute uniquely affected and was uniquely affected by the core bankruptcy functions as to 'matters concerning the administration of the estate,'" (*id.*), and the "allowance or disallowance of claims against the estate." *Id.*

The Second Circuit continued:

The proof of claim, as well as the [landlord] motion and [landlord's] objections to the plan of reorganization, required the bankruptcy court to interpret the lease in order to determine what assets of the debtors' estate should be distributed to [landlord]. Thus, the interpretation of the lease was originally raised as

part of the bankruptcy court's core function of determining whether to allow [landlord's] claim in the administration of the estate.

*Id.* The Second Circuit further noted that the landlord's claim against the *purchaser* was identical to the landlord's claim against the *estate, id.*, and was "a continued attempt by [landlord] to recover rent originally claimed from the estate. As such, it uniquely affected and was uniquely affected by the bankruptcy court's core functions of determining [landlord's] claim and administering the estate." *Id.*

That is instructive for the analysis here, because here there are significant similarities in both respects. In the first respect, just as in *Petrie Retail*, where the court had to interpret the lease in order to determine what assets of debtor's estate should be distributed on the landlord's administrative expense claim, here the Court would have to examine the Optical Sanwa financing documents to determine whether or not to allow a distribution to Sanwa on its proof of claim. In the second respect, the present dispute is in some respects the mirror image of the *Petrie Retail* contro-

---

cussed *Katchen* and *Granfinanciera* under a heading of personal, rather than subject matter, jurisdiction. See 304 F.3d at 231. But it is not clear whether that court would have held that those cases involved personal jurisdiction, rather than subjection matter jurisdiction, if it actually ruled on the matter. *Katchen* dealt with the types of claims that could be asserted under the summary jurisdiction of the bankruptcy court under the former Bankruptcy Act. That summary jurisdiction was a limited subject matter jurisdiction, which, when absent, required a suit in a plenary action in a state court or federal district court. *See* 9 *Collier on Bankruptcy* ¶ 3006.01, at page 3006–2 to 3006–3 ("Under the Bankruptcy Act, filing a proof of claim could provide jurisdiction to the bankruptcy court that it might not otherwise have. This was due to the distinction between summary and plenary jurisdiction"). This Court believes

that the better view is that *Katchen* should be read as a *subject matter* jurisdiction, and not a *personal* jurisdiction, case. *See In re Hallahan*, 936 F.2d 1496, 1503 (7th Cir. 1991) ("The main holding in *Katchen* involved the bankruptcy court's subject matter jurisdiction"). However, this may be academic in instances, such as this one, where the matter in controversy is so linked to the claims allowance process.

18. After noting that "core" jurisdiction is to be construed broadly, "close to or congruent with constitutional limits," *Petrie Retail*, 304 F.3d at 229 (internal quote marks deleted), the Second Circuit noted that proceedings can be core by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, or (2) the proceedings directly affect a core bankruptcy function.

versy (because Sanwa now takes a position wholly or nearly the opposite of the position it took when it filed its claim), and it therefore is not, strictly speaking, identical to it, but it still raises the same issues with respect to the same transaction, and still "affected and was uniquely affected by the bankruptcy court's core functions of determining [Sanwa's] claim and administering the estate." In any event Sanwa put the entire controversy on the table when it filed its proof of claim.

At the time Vision's complaint was filed, this Court also had jurisdiction under the "related to" prong of 28 U.S.C. § 1334. Under *Cuyahoga Equipment* and the other cases applying *Pacor*, there must be an effect upon the estate, but it need only be "any conceivable effect." Here that requirement is easily satisfied. There was a huge overlap between the issues raised by Vision in its adversary complaint and those before the Court by reason of Sanwa's claim and the Creditors' Committee objection. At the time Vision's complaint was filed, the allowability, *vel non*, of Sanwa's secured claim against the estate was very much up in the air, and the findings in this adversary proceeding, by reason of res judicata, collateral estoppel, or some combination of the two would plainly be relevant to that determination.

### B.

Jurisdiction over this controversy also exists by reason of the role of the Sale Order in this litigation, and the efforts underway at the time the adversary proceeding was commenced, which continued thereafter, to adjudicate Vision's rights under it.

One of the factors resulting in the determination by the *Petrie Retail* court that the dispute there was a core matter was the fact that the contract dispute involved rights specifically established by the sale order, *Petrie Retail,* 304 F.3d at 230, and,

accordingly, "the dispute was uniquely affected by and inextricably linked to the bankruptcy court's Sale Order." *Id.* at 230 (internal quote marks deleted). In this case, the Sale Order incorporated the Purchase Agreement by reference, including provisions that transferred the rights to the Franchisee Notes, as far as the estate was concerned, to Vision, and that deemed the Franchisee Notes to be collateral for secured debt. Though plainly, Sanwa obtained a reservation of rights with respect to that treatment and was not bound by it, and Sanwa was thus protected as a matter of *substance* under the Sale Order, Vision nevertheless derived from the Sale Order the standing to assert its claims, and whatever rights it has now. The substantive rights Vision thereby obtained were still subject to Sanwa's, but, as in *Petrie Retail,* Vision's rights were "uniquely affected by and inextricably linked to the bankruptcy court's Sale Order." *Id.* (Internal quote marks deleted).

That is particularly so since Judge Garrity could have decided the "true sale" issue before, or in conjunction with, entry of the Sale Order, but decided, for understandable reasons, not to delay the sale pending the determination of the controversy. It is hardly a surprise that Judge Garrity determined, incident to the sale approval hearing and resulting order, to provide simply for a reservation of rights on Sanwa's part in the Sale Order, and not to determine, on a section 363 motion, all of the underlying issues. But it is plain that at the time the adversary complaint was filed, Judge Garrity had the need to and was going to decide them, and initially, and at the time the adversary complaint was filed, proceedings with respect to the adversary complaint were to be coordinated with the proceedings on the objection to the proof of claim.

At the time this adversary proceeding was commenced, Sanwa's claim still had an effect on the Optical estate sufficient to warrant the Creditors' Committee's efforts to object to it—much more than satisfying the "conceivable effect" test of *Cuyahoga* and its progeny—and Vision and the Optical estate (now represented by its Creditors Committee) were allies in the Creditors' Committee's efforts to resist Sanwa's claim and seek discovery with respect to possible inconsistent positions Sanwa had taken with respect to its position in this Court.

Judge Garrity's decision to defer the determination of the underlying issues to a separate proceeding, rather than deciding whether or not the Franchisee Notes were then sold to Vision at the time he considered the sale order (which was a matter as to which he plainly had subject matter jurisdiction and which, indeed was core matter), did not mean that the bankruptcy court lacked subject matter jurisdiction to consider those issues at a later time. Indeed, exactly the contrary is true, and they remained core matters. *See In re Kewanee Boiler Corp.*, 270 B.R. 912, 917 (Bankr. N.D.Ill.2002) (Schmetterer, J.) ("Proceedings flowing from a core matter are themselves core matters").

The recent decision by Chief Judge Bernstein of this Court in *In re Cedar Chemical Corp.*, 294 B.R. 224 (Bankr. S.D.N.Y.2003), is also instructive. In *Cedar Chemical* too the court was faced with a dispute between non-debtors, and a contention that the bankruptcy court lacked subject matter jurisdiction over the controversy. Judge Bernstein rejected the argument. Analyzing *Petrie Retail*, he concluded that he had core jurisdiction over the matter in controversy, *id.* at 229, for three reasons, two of which are applicable here. He found that the matters before him involved the interpretation of a post-petition contract and the Court's order approving the transaction, *id.*, and that the contract dispute implicated "the Court's core function of conducting and approving asset sales." *Id.* For the reasons stated above, this Court regards those reasons to be applicable here as well.

## C.

Of course Sanwa tried to cut the jurisdictional umbilical cord in 1997, after the adversary proceeding had been commenced and Vision and the Optical Creditors Committee had sought discovery of Sanwa. Sanwa attempted to do so, it appears, by purporting to waive distributions under the proof of claim it had filed earlier. But the Sanwa effort was ineffective to divest the bankruptcy court of its jurisdiction over the controversy for at least two separate reasons. First, litigants cannot properly deprive a Court of jurisdiction by reason of tactical gambits after a litigation is underway. *See Peoples*, 250 S.E.2d at 911. And secondly, even assuming, *arguendo*, that what Sanwa did was not a tactical gambit at all, it is clear, as the cases noted above hold explicitly, that jurisdiction is measured as of the time of the filing of the complaint, and that "[e]vents occurring subsequent to the institution of suit ... do not oust jurisdiction." *St. Paul, supra*, 303 U.S. at 289–290, 58 S.Ct. 586. *See also Hutchins, supra*, 145 B.R. at 122.[19]

19. Citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997), Sanwa attempts to address these holdings, suggesting that jurisdiction "can and will cease based upon events subsequent the filing of an action." (Sanwa Reply Br. ¶ 16–17). However, *Arizonans for Official English* was a mootness case, holding that the case ceased to be a justiciable controversy because the underlying controversy had become moot. Here there can be no such suggestion.

Finally, the Court rejects Sanwa's contention that the closing of Optical's chapter 11 case caused this Court to forfeit the subject matter jurisdiction that it had. The closing of an umbrella chapter 11 case is immaterial to the Court's subject matter jurisdiction in connection with a related adversary proceeding. A court's jurisdiction "does not evaporate with the closing of a bankruptcy case." *Speleos v. McCarthy,* 201 B.R. 325, 329 (D.D.C.1996). To the contrary, the closing of a bankruptcy case is simply an administrative matter, and "does not affect a bankruptcy court's jurisdiction to determinate matters relevant to the case." *In re Taylor,* 216 B.R. 515, 521 (Bankr.E.D.Pa.1998).

*Conclusion*

Sanwa's motion to dismiss for alleged lack of subject matter jurisdiction is denied. To the extent they have not already done so, the parties shall complete their mandatory disclosures under Fed.R.Civ.P. 26, and shall confer to make a joint recommendation, if possible, with respect to a scheduling order, including discovery and other pretrial matters.

SO ORDERED.