In re CEDAR CHEMICAL CORPO-
RATION and Vicksburg Chemi-
cal Company, Debtors.

Nos. 02–11039(SMB), 02–11040(SMB).

United States Bankruptcy Court,
S.D. New York.

June 20, 2003.

Torys LLP, New York City, William F. Gray, Jr., of Counsel, for Makhteshim Agan of North America, Inc.

Duane Morris LLP, Philadelphia, PA, Lawrence J. Kotler, Christopher J. Redd, of Counsel, for 2,4–DB Task Force.

**MEMORANDUM DECISION AND ORDER REGARDING THE ASSIGNMENT OF THE 2,4–DB TASK FORCE AGREEMENT**

STUART M. BERNSTEIN, Chief Judge.

The current dispute is between two non-debtors, but arises from a bankruptcy sale through which the debtor, Cedar Chemical Corporation, assumed and assigned its membership in a certain task force, described below, to Makhteshim–Agan of North America, Inc. ("MANA"). The task force agreement contained a clause requiring the members to consent in writing to the assignment, and the members have refused to give their consent.

MANA brought this motion to compel the task force to accept the assignment and admit it as a member. The main quarrel involves whether the consent requirement is enforceable despite the provisions of 11 U.S.C. § 365(f)(1). For the reasons that follow, I conclude that it is.

**BACKGROUND**

**A. The Task Force Agreement**

At all relevant times prior to these chapter 11 proceedings, the debtor was engaged in the production and sale of specialty chemicals for the agricultural, industrial and pharmaceutical industries. (*Sale Motion* ¶ 7.)[1] The debtor held numerous registrations for its products with the United States Environmental Protection Agency (the "EPA"). A registration allowed the debtor to distribute and sell the registered product. (*Id.*) One of these registrations concerned a pesticide containing 4–(2,4 dichlorophenoxy) butyric acid, or 2,4–DB. Other companies also held registrations to produce and sell products containing 2,4–DB.

The EPA apparently imposes an ongoing obligation on registrants to develop and supply data relating to these chemicals. Toward that end, registrants of the same chemical sometimes enter into a task force agreement to work jointly to satisfy the EPA requirements and otherwise promote the registrants' interests. Consistent with that practice, the debtor, togeth-

---

1. *"Sale Motion"* refers to the debtor's *Motion For An Order Fixing Dates, Times And Place of Hearings On Motion For Further Orders Pursuant To, Inter Alia, Sections 105, 363(b), 363(f), 365 And 1146(c) Of The Bankruptcy Code And Rules 2002, 6004, 6006, 9002, 9007 And 9008 Of The Federal Rules Of Bankruptcy Procedure: (i) Authorizing The Debtor To Sell Certain Assets Free And Clear Of Liens And Claims To Control Solutions, Inc. Or To Any Bidder Submitting A Higher Or Better Offer Pursuant To The Terms Of A Purchase Agreement; (ii) Authorizing The Debtor To Assume And Assign Certain Executory Contracts To Control Solutions, Inc.; (iii) Approving A Break–Up Fee And Bidding Procedures; (iv) Fixing Manner and Extent Of Notice Of Sale Hearing; (v) Authorizing The Exemption Of The Sale From Stamp Or Similar Taxes And From The Provisions Of Bankruptcy Rules 6004(g) And 6006(d), And (vi) Granting Related Relief*, dated September 4, 2002.

er with A.H. Marks & Company, Ltd., Aceto Agricultural Chemical Corp. and Atanor Sociedad Anonima entered into the Third Amended & Restated 2,4–DB Task Force Agreement (the "Task Force Agreement")[2]. Its stated purpose was to develop, acquire, own and defend the data required by the EPA regarding the use of 2,4–DB, preserve the registrations, and assert rights to compensation for the use of the data developed by the Task Force. (*Task Force Agreement* ¶ 1; *accord Task Force Objection* ¶ 2.)

Important to the present motion, the Task Force Agreement contained a restriction on assignment:

> Neither this Agreement nor any interest of the members of the Task Force herein ... may be assigned, pledged or transferred without the prior written consent of all of the members of the Task Force, which consent shall not be unreasonably withheld. Any assignee or transferee of such interest consented to by all members of the Task Force shall assume such party's obligations pursuant to this Agreement....

(*Task Force Agreement* ¶ 17.)

**B. The Bankruptcy Sale**

The debtor filed this chapter 11 case on March 8, 2002, and proceeded to liquidate its assets. On or about August 27, 2002, the debtor entered into a Purchase Agreement with Control Solutions, Inc. ("CSI")[3]. In the main, the Purchase Agreement covered the sale of the debtor's various EPA pesticide registrations and pending applications for registration. The Purchase Agreement also proposed to assign the debtor's membership interest and rights of membership in the 2,4–DB Task Force and the Spray Drift Task Force. The transaction was subject to higher and better offers, *i.e.*, an auction.

The proposed assignments were conditional in nature. The Recitals in the Purchase Agreement, at page 1, stated that the debtor was assigning the two task force agreements "to the extent assignable." One of the conditions of closing was the entry of a final order authorizing the assumption and assignment of any contract required to be assigned under the Purchase Agreement "subject to the assignment terms of such contracts." (Purchase Agreement § 5(b).) Finally, the parties were required to execute two Task Force Assignment and Assumption Agreements, attached as Exhibit D to the Purchase Agreement. (*See id.* § 4(c)(iv).) Paragraph 1 of the 2,4–DB Task Force Assignment and Assumption Agreement included the buyer's acknowledgment that the assignment was ineffective unless the buyer satisfied the appropriate provisions of the Task Force Agreement:

> Cedar hereby sells, assigns and transfers to CSI its right, title and interest in and to the Membership under the 2,4–DB Task Force Agreement. *CSI acknowledges that this Assignment alone is not sufficient to effect a valid trans-*

---

2. The Task Force Agreement is attached as Exhibit A to the *Response and Objection of the 2,4–DB Task Force to Motion of Makhteshim Agan of North America, Inc. to Compel the 2,4–DB Task Force, A.H. Marks & Company, Ltd., Aceto Agricultural Chemical Corp., Atanor Sociedad Anonima and Albaugh, Inc. to Accept and Acknowledge the Assignment of Cedar Chemical Corporation's Rights Under the Third Amended and Restated 2,4–DB Task*

Force Agreement, dated May 27, 2003 (the "*Task Force Objection*").

The parties have also referred to Albaugh, Inc. as a member of the Task Force. Albaugh did not sign the Task Force Agreement, and the Task Force Agreement did not identify it as a party. Its membership, however, is immaterial to the Court's determination.

3. The Purchase Agreement is attached as Exhibit B to the Sale Motion.

*fer of the Membership and CSI further acknowledges that in order for such transfer to be effected it will be required to comply with all of the appropriate provisions of the 2.4–DB Task Force Agreement.* CSI hereby accepts such assignment and agrees to assume Cedar's obligations as a "Member" ... with respect to the Membership, to cure any and all defaults of Cedar under the 2,4–DB Task Force Agreement, and to comply with all of the terms and conditions of the 2,4–DB Task Force Agreement.... (Emphasis added.)

The Sale Motion repeated these limitations, reaffirming the conditional nature of the assignment. It emphasized that the sale included the assignment of all of the debtor's membership interest and rights of membership in certain task forces, including those arising under the Task Force Agreement, "to the extent assignable." (*Sale Motion* ¶ 11(c).) It referred to the closing condition requiring the debtor to obtain an order approving the sale and authorizing the assumption and assignment of the Task Force Agreements, "subject to the assignment terms and provisions thereof." (*Id.* ¶ 13.) Finally, it reconfirmed the need to satisfy the assignment provisions of the Task Force Agreement:

As set forth above, the Agreement provides for the assignment, to the extent possible, of Cedar's membership interest and rights in the Task Force Agreements. As set forth on the Task Force Assignment and Assumption Agreements annexed as Exhibit "D" to the Agreement, upon approval of the Agreement, Cedar will sell, assign and transfer to CSI its right, title and interest in and to its task force memberships under the respective Task Force Agreements. *The Assignment and Assumption Agreement also provides an acknowledgment by CSI that this as-*

*signment alone is not sufficient to effect a valid transfer of the memberships and that in order for such transfer to be effected, CSI will be required to comply with all of the appropriate provisions of the Task Force Agreements. Accordingly, while Cedar is assigning to CSI all of its rights, title and interest in those Task Force Agreements, it is ultimately the responsibility of CSI to comply with all provisions of the Task Force Agreements to obtain complete assignment of Cedar's membership interests and rights.* CSI further agrees to assume all of Cedar's obligations under the Task Force Agreements, and to cure any and all defaults of Cedar under the Task Force Agreements (in an amount to be agreed upon by the parties or ordered by the Court).

(*Id.* ¶ 40)(emphasis added.)

Pursuant to the Sale Motion, the Court conducted an auction on October 8, 2002. MANA outbid CSI, and was awarded the contract. The Court signed an order approving the sale to MANA on October 8, 2002. (*Order Pursuant to 11 U.S.C. §§ 105, 363 and 365 (A) Approving Sale of Certain of Debtor's Assets Free and Clear of Liens and Claims; (B) Authorizing Assumption and Assignment to Purchaser of Certain Executory Agreements; and (C) Exempting the Sale from the Provisions of Bankruptcy Rules 6004(g) and 6006(d),* dated Oct. 8, 2002) (the "Approval Order.") Paragraph 3 of the Approval Order stated that "[n]othing herein shall override the Purchaser's obligation to comply with all appropriate provisions of the Task Force Agreement in order for the assignment to be effected." Lastly, the Court retained jurisdiction "to enforce the provisions of the Agreement and the Approval Order in all respects." (*Id.* ¶ 19.) On the same day, MANA executed an identical Pur-

chase Agreement, and presumably, the 2,4–DB Task Force Assumption and Assignment Agreement.[4]

### C. This Motion

As noted, the Task Force members did not consent to the assignment. Consequently, on May 8, 2003, MANA filed the instant motion (the *"MANA Motion"*)[5] to compel the Task Force members to consent to the assignment and admit MANA as a member. MANA's motion advanced three arguments. First, the "appropriate provisions" language in the Approval Order did not refer to or include the written consent requirement in the Task Force Agreement because the consent provision was void under § 365(f)[6]. (*MANA Motion* ¶ 17.) Second, § 365(c)(1)[7] was inapplicable, but in any event, the Task Force had failed to object to the assignment. (*Id.* ¶¶ 18–19.) Third, the Task Force vio-

lated the Task Force Agreement by unreasonably withholding its consent to the assignment. (*Id.* ¶¶ 20–22.)

The Task Force responded, challenging the Court's subject matter jurisdiction over this non-debtor dispute, and arguing that absent jurisdiction, venue was improper. (*See Task Force Objection* ¶¶ 14–20.) Turning to the merits, the Task Force contended that the sale documents were unambiguous, and expressly incorporated the consent requirement. (*Id.* ¶¶ 22–27.) Further, MANA's interpretation contradicted its earlier position that consent was required. (*Id.* ¶ 28.) The Task Force also argued that the Task Force Agreement was not assumable and assignable under § 365(c)(1), (*id.* ¶ 31), the Task Force members had not consented to MANA's membership, and had not unreasonably withheld their consent. (*Id.* ¶¶ 32–41.)

---

4. The parties submitted a copy of the Purchase Agreement executed by MANA, but did not provide an executed copy of the 2,4–DB Task Force Assumption and Assignment Agreement. Its execution, however, was a condition to closing. In addition, the Task Force referred to it in the *Task Force Objection* and during oral argument, and MANA never suggested that it had not been executed.

5. *"MANA Motion"* refers to the *Motion for an Order Compelling the 2,4–DB Task Force, A.H. Marks & Company, Ltd., Aceto Agricultural Chemicals Corp., Atanor Sociedad Anonima and Albaugh, Inc. to Accept and Acknowledge the Assignment of Cedar Chemical Corporation's Rights Under the Third Amended and Restated 2,4–DB Task Force Agreement to Makhteshim Agan of North America, Inc.,* dated May 8, 2003.

6. Section 365(f) states in pertinent part:
   (f)(1) Except as provided in subsection (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . .;

   (2) The trustee may assign an executory contract or unexpired lease of the debtor only if—
   (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
   (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

7. Section 365(c)(1) states:
   (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
   (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
   (B) such party does not consent to such assumption or assignment.

Following argument of the motion, the Court advised the parties that it would initially address the questions relating to the possible ambiguity and ultimate interpretation of the Purchase Agreement, the 2,4–DB Task Force Assignment and Assumption Agreement and the Approval Order (collectively, the "Sale Documents"). Thus, this opinion does not address whether the Task Force unreasonably withheld its consent to the assignment of the Task Force Agreement.

## DISCUSSION

### A. Subject Matter Jurisdiction

■ The Task Force maintains that this Court lacks subject matter jurisdiction. Concededly, this contract dispute is between nondebtors, and the outcome will not affect the estate. The Court nevertheless has core jurisdiction, at least to the extent that it is called upon to interpret the Sale Documents:

> [W]hether a contract proceeding is core depends on (1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization.... Proceedings can be core by virtue of their nature if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings, ... or (2) the proceedings directly affect a core bankruptcy function.

*In re Petrie Retail, Inc.,* 304 F.3d 223, 229 (2d Cir.2002) (quoting *United States Lines, Inc. v. Am. Steamship Owners Mut. Protection & Indem. Ass'n, Inc. (In re United States Lines, Inc.)),* 197 F.3d 631, 637 (2d

Cir.1999)) (internal quotation marks omitted). Here, the preliminary question before the Court involves the interpretation of a post-petition contract and the Court's own order approving the transaction.

In addition, the contract dispute is "uniquely affected and was uniquely affected by core bankruptcy functions." *Petrie Retail,* 304 F.3d at 231. The principal question is whether § 365(f)(1) invalidated the consent requirement. The dispute involves a question of bankruptcy law, and implicates the Court's core function of conducting and approving asset sales. *See* 28 U.S.C. § 157(b)(2)(N). Accordingly, the Court enjoys core jurisdiction over this aspect of the parties' contest,[8] and the conclusion regarding jurisdiction also disposes of the Task Force's objection to venue.

### B. The Interpretation of the Sale Documents

■ The primary objective in interpreting a contract is to give effect to the parties' intent as revealed in the language that they used. *Golden Pac. Bancorp v. FDIC,* 273 F.3d 509, 515 (2d Cir.2001); *Brass v. American Film Tech., Inc.,* 987 F.2d 142, 148 (2d Cir.1993); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1094 (2d Cir. 1993). The parties' unexpressed and subjective views are not controlling. *Nycal Corp. v. Inoco PLC,* 988 F.Supp. 296, 301 (S.D.N.Y.1997); *Mencher v. Weiss,* 306 N.Y. 1, 114 N.E.2d 177, 181 (1953); *cf. Wells v. Shearson Lehman/ American Express, Inc.,* 72 N.Y.2d 11, 530 N.Y.S.2d 517, 526 N.E.2d 8, 15 (1988)("[u]ncommunicated

---

**8.** Although I have concluded that core jurisdiction exists, the distinction between core and non-core jurisdiction is not important for present purposes. Either party will be entitled to *de novo* review of my conclusion that the Sale Documents are unambiguous, *see*

*Red Ball Interior Demolition Corp. v. Palmadessa,* 173 F.3d 481, 484 (2d Cir.1999), and the interpretation of those unambiguous documents. *See Olin Corp. v. Insurance Co. of N. Am.,* 221 F.3d 307, 320 (2d Cir.2000).

subjective intent alone cannot create an issue of fact where otherwise there is none"). Whether an agreement is ambiguous presents a question of law that a court must decide in light of the entire agreement. *Albany Sav. Bank, FSB v. Halpin,* 117 F.3d 669, 673 (2d Cir.1997); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d at 1094–95.

A party cannot create an ambiguity simply by offering an alternative interpretation of the contract. *Brass v. American Film Tech., Inc.,* 987 F.2d at 149; *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). Instead, an agreement is ambiguous only if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who examines the entire contract and knows the customs, practices, usages and terminology generally understood in the particular trade or business. *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d at 1095; *Brass v. American Film Tech., Inc.,* 987 F.2d at 149. If the court concludes that the agreement is unambiguous, parole evidence is inadmissible to explain its meaning, and the court is obliged to enforce its plain terms. *See RJE Corp. v. Northville Indus. Corp.,* 329 F.3d 310, 314 (2d Cir. 2003); *Omni Quartz, Ltd. v. CVS Corp.,* 287 F.3d 61, 64 (2d Cir.2002).

MANA and the debtor, in this regard, were free to enter into an assignment agreement that waived the benefits of § 365(f). *See In re J.F. Hink & Son,* 815 F.2d 1314, 1318 (9th Cir.1987)(assignee waived benefit of § 365(f)(3) by agreeing to an assignment of the debtor's lease expressly made subject to the lease provision authorizing the landlord to renegotiate the rent following an assignment). If the parties intended to condition the assignment on compliance with the Task Force members' consent despite § 365(f),

the Court will enforce that intention. Accordingly, § 365(f) does not bar the conclusion that MANA must procure the members' consent if that is the agreement that MANA and the debtor struck.

Here, the Task Force has proposed a reasonable interpretation of the Sale Documents. The Purchase Agreement stated that the rights were being assigned "to the extent assignable." This and the other provisions previously mentioned were undoubtedly a concession to the possible effect of § 365(c) of the Bankruptcy Code. The Task Force Agreement was similar to a partnership agreement, and partnership membership is not ordinarily assignable under non-bankruptcy law in the absence of the other partners' consent. *In re Schick,* 235 B.R. 318, 324 (Bankr.S.D.N.Y. 1999).

Other provisions in the Sale Documents focused directly on the assignment provisions of the Task Force Agreement. The 2,4 DB Assignment and Assumption Agreement contained an acknowledgment that the assignment "alone is not sufficient to effect a valid transfer of the Membership and [MANA] further acknowledges that in order for such transfer to be effected it will be required to comply with all of the appropriate provisions of the 2.4–DB Task Force Agreement." Furthermore, the closing was conditioned, *inter alia,* on the entry of a final order "authorizing the assumption and assignment of any contract required to be assigned hereunder (subject to the assignment terms of such contracts)." In addition, ¶ 3 of the Approval Order stated that "[n]othing herein shall override the Purchaser's obligation to comply with all appropriate provisions of the Task Force Agreements in order for the assignment to be effected."

MANA's interpretation, on the other hand, is unreasonable. It argues that the phrase "appropriate provisions of the Task

Force Agreement" in ¶ 3 of the Approval Order cannot refer to the consent requirement because the consent requirement was invalid under § 365(f), and was therefore "inappropriate." (*MANA Motion* ¶ 17.) Instead, MANA argues, the "appropriate provisions" refer to the assignee's obligations under § 365(b) to cure defaults and provide adequate assurance of future performance. (*Supplemental Memorandum in Support of MANA's Motion for an Order Compelling the 2,4–DB Task Force, A.H. Marks & Company, Ltd., Aceto Agricultural Chemicals Corp., Atanor Sociedad Anonima and Albaugh, Inc. to Accept and Acknowledge the Assignment of Cedar Chemical Corporation's Rights under the Third Amended and Restated 2,4–DB Task Force Agreement to Makhteshim Agan of North America, Inc. ("The Motion to Compel"*), dated June 5, 2003, ¶ 8.)

Initially, the argument is circular, since the parties can waive § 365(f), making the incorporation of the consent provision "appropriate." Moreover, MANA's interpretation of the Approval Order makes no sense. The "appropriate provisions of the Task Force Agreements" mentioned in ¶ 3 of the Approval Order cannot possibly refer to the § 365(b)(or § 365(f)(2)) cure and adequate assurance requirements of the Bankruptcy Code. The Task Force Agreement was a pre-petition agreement, did not incorporate these bankruptcy law con-

cepts, and did not even condition an assignment on either curing past defaults or providing adequate assurance of future performance.[9] Rather, the "appropriate provisions" language referred to the two obligations imposed on the assignee under ¶ 17 of the Task Force Agreement, the only paragraph dealing with assignments: (1) obtain the written consent of the other members, and (2) assume the assignor's obligations.

Lastly, MANA's interpretation ignores the language in the 2,4–DB Task Force Assignment and Assumption Agreement. The assignee acknowledged that it must comply with the "appropriate provisions" of the Task Force Agreement before the assignment of the debtor's membership would be valid. The next sentence stated that the assignee promised "to cure any and all defaults" by the debtor. If the "appropriate provisions" in the Approval Order referred to the cure obligations under the Bankruptcy Code, the additional promise to cure all defaults would be superfluous.[10]

Accordingly, the only reasonable interpretation of the Sale Documents is the one proposed by the Task Force. The Sale Documents unmistakably require MANA to satisfy the consent requirement in the Task Force Agreement to effectuate the transfer of the debtor's membership and

---

9. There would be no reason for the Task Force Agreement to include these requirements since the members were free to withhold their consent to an assignment. Thus, they could refuse to consent unless the assignee met with their satisfaction or the assignee cured the assignor's defaults, or both. On the other hand, they might conclude that they would be better off cutting the Task Force's losses, and substituting a solvent assignee for an insolvent assignor. In the latter circumstance, they might not insist on a cure as a condition to an assignment.

10. In fact, MANA's Supplemental Memorandum, at ¶ 9, relied on the portion of the Sale Motion (¶ 40), quoted *supra*, that reiterated the buyer's requirement to comply with "all provisions" of the Task Force Agreement to effect the "complete assignment of Cedar's membership interests and rights," and the "further" agreement to cure defaults and assume the debtor's obligations under the Task Force Agreement. Obviously, the cure obligations were "further" or in addition to the assignee's duty to satisfy the assignment terms imposed under the Task Force Agreement.

rights thereunder. MANA's unstated expectation that the consent requirement was invalid is hard to fathom, but in any event, ignores the unambiguous language in the Sale Documents.

 Before ending, I turn briefly to the Task Force's argument that the assignment was invalid under § 365(c). The Task Force failed to raise this argument in opposition to the Sale Motion, and is arguably barred from asserting it at this late date. *Cf. United States v. Carolina Parachute Corp.*, 907 F.2d 1469, 1473 (4th Cir. 1990)(*res judicata* barred Government from asserting that § 365(c)(1) prohibited assumption of its contract with the debtor where the plan expressly provided for assumption and the Government failed to object to confirmation or appeal the confirmation order). In any event, a contract otherwise unassignable under § 365(c)(1) can be assumed and assigned if the non-debtor party consents. 11 U.S.C. § 365(c)(1)(B). Paragraph 17 of the Task Force Agreement reflected that consent, and the conditions placed on the assignment in the Sale Documents were consistent with the consent provision. *See In re Midway Airlines, Inc.*, 6 F.3d 492, 496 (7th Cir.1993)(notwithstanding § 365(c)(1), airport owner consented to debtor-airline's assumption and assignment of gate lease where underlying lease contained consent to such assignment).

The foregoing disposes of the dispute regarding the interpretation of the Sale Documents. The remaining question concerns whether the members unreasonably withheld their consent to a proposed assignment in violation of the Task Force Agreement. The parties are directed to file memoranda of law within two weeks of the date of this order that address (1) whether this Court has jurisdiction to hear that dispute, and (2), if the Court has jurisdiction, whether it should nevertheless abstain from exercising it.

SO ORDERED.