**In re KMART CORPORATION, et al., Debtors.**

**No. 02 B 2474.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Feb. 22, 2005.

William J. Barrett, George R. Mesires, Gillian E. Munitz, Kimberly J. Robinson, Barack Ferrazzano Kirschbaum, George R. Mesires, Gardner Carton & Douglas LLC, Chicago, IL, Andrew N. Goldman, Wilmer, Cutler and Pickering, Michael J. Canning, New York, NY, Craig Goldblatt, Wilmer Cutler Pickering Hale & Dorr LLP, Eric R. Markus, Washington, DC, David E. Gordon, Northbrook, IL, Victoria F. Maroulis, Quinn Emanuel Urquhart Oliver etc, Redwood Shores, CA, Jon R. Steiger, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA, Michelle Bock, Elisabetta G. Gasparini, James H. Geary, Joseph M. Harrison, IV, Lisa A. Lynch, Patrick M. McCarthy, Charles A. Newman, Julie E. Patterson, Robert O. Sands, Brian A. Sher, Jeremy S. Simon, Michael Snyder, for Debtors.

### MEMORANDUM OPINION

SUSAN PIERSON SONDERBY, Bankruptcy Judge.

This matter comes before the court on the Motion of DDR MDT Midway Market-place LLC ("DDR") to Clarify this Court's April 15, 2003 Order Authorizing Assumption and Assignment of Certain Property to Wal–Mart (the "Motion"). For the reasons set forth herein, the Motion is denied for lack of jurisdiction.

### BACKGROUND

On January 22, 2002 (the "Petition Date"), Kmart Corporation and thirty-seven of its affiliates filed voluntary petitions for reorganization under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Code"). The court entered an order on the Petition Date providing for the joint administration of the estates pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure. On April 23, 2003, the court entered an order (the "Confirmation Order") confirming the First Amended Joint Plan of Reorganization of Kmart Corporation and its Affiliated Debtors and Debtors–in–Possession (the "Plan"). The Plan became effective on May 6, 2003 (the "Effective Date").

In October of 1994, Kmart entered into a lease (the "St. Paul Lease") pursuant to which it leased approximately 114,000 square feet of retail space (the "Former Kmart Store") in the Midway Marketplace Shopping Center in St. Paul, Minnesota (the "Shopping Center") from DDR's predecessor-in-interest. There are a number of other retail stores in the Shopping Center, including one operated by Supervalu, Inc. as a "Cub" supermarket. The St. Paul Lease and all other leases of space in the Shopping Center are subject to a Reciprocal Easement Agreement regulating and restricting each tenant's use of its store ("REA").

The St. Paul Lease provides, in pertinent part,

so long as the Supervalu Lease is in effect, except for [Supervalu/Cub], no

portion of the Shopping Center will be occupied or leased as a supermarket, convenience food market, grocery store or department within a store or other store facility or department within a store for the retail or wholesale purveyance for off-site consumption of food, fruit, vegetables, dairy produces, cookies, candy, groceries, produce, bakery products, meats, and/or delicatessen products and/or other miscellaneous foods (excluding stores which primarily sell prepared sandwiches for on– or off-site consumption); provided, however that (i) the occupant of [the Former Kmart Store] shall be permitted to sell such items so long as no more than 7,500 square feet of Gross Floor Area, including aisles, nor more than ten percent (10%) of the lineal feet of shelving in such occupant's premises are used for the sale of such products, and so long as such items do not include any fresh baked goods or perishable fresh or frozen meat, fish, poultry, produce or diary products, which such occupant shall not sell . . .

Exhibit E to St. Paul Lease, ¶ 32.

On April 15, 2003, this court entered an order authorizing Kmart to, *inter alia,* assume, sell and assign the St. Paul Lease to Wal–Mart Stores, Inc. (the "Assignment Order") pursuant to Section 365 of the Code.[1] The Assignment Order contemplated that Kmart's authorization to assign the St. Paul Lease would be pursuant to the terms of a proposed form Lease Assignment and Assumption Agreement attached as an exhibit to the Assignment Order. That form Agreement provided, *inter alia,*

3. *Assumption of Leasehold Obligations.* Assignee hereby accepts the foregoing assignment and cove-

nants with Assignor, that from and after the Assignment Date, Assignee and its successors and assigns hereby assume and agree to keep, perform, fulfill or cause to be performed all of the terms, covenants, conditions and obligations contained in the Lease, which, by the respective terms therein, are imposed upon Assignor.

4. *Ratification of Lease.* Assignor and Assignee hereby ratify, reaffirm and adopt and agree that the Lease shall be in full force and effect as to Assignee.

On April 22, 2003, Kmart and Wal–Mart executed a Lease Assignment and Assumption Agreement with respect to the St. Paul Lease and a separate REA Assignment Agreement pursuant to which Kmart assigned its rights and obligations under the REA to Wal–Mart.

The Assignment Order also provides in the decretal portion at subparagraph (f),

While the Court does not expressly decide the issue of whether the [Former Kmart Store] is part of a "shopping center" within the meaning of Section 365, all of the so-called "shopping center" provisions of the Bankruptcy Code with respect to the assumption of a shopping center lease have been satisfied in connection with the assumption and assignment of the [St. Paul Lease] and . . . the Purchaser's use of the premises is in a manner consistent with its typical retail operations.

Approximately one month after receiving the assignment of the St. Paul Lease, Wal–Mart commenced retail operations from the Former Kmart Store. DDR contends that Wal–Mart is currently selling

---

1. Section 365 of the Code authorizes, *inter alia,* the trustee to assume and assign unexpired real property leases. 11 U.S.C. § 365(a). The debtor in possession in a chapter 11 case has the rights of a trustee. 11 U.S.C. § 1107(a).

grocery items, such as fresh and frozen meat, fish, poultry, produce and dairy products, in contravention of the use restrictions in the REA. Wal–Mart is also purportedly using more than the square footage allowable under the St. Paul Lease for the sale of non-perishable grocery items.

DDR sent Wal–Mart a letter dated May 28, 2004, with a copy to Supervalu's counsel, notifying Wal–Mart that it was in default under the St. Paul Lease and demanding that Wal–Mart "cease the sale of any and all items violating the 'prohibited uses' ... of the REA." In response, Wal–Mart sent correspondence dated June 8, 2004, to Supervalu's counsel setting out Wal–Mart's position that the terms of the Assignment Order authorized it to operate the Former Kmart Store in a manner consistent with Wal–Mart's "typical retail operations," which include the present grocery sales. A similar letter dated June 9, 2004, was sent by Wal–Mart to DDR's counsel. Another letter dated June 21, 2004, was sent by DDR to Wal–Mart further elaborating DDR's position that Wal–Mart defaulted under the St. Paul Lease and advising that if Wal–Mart did not stop its continuing violation of the St. Paul Lease and REA, "[DDR] shall seek not only injunctive relief to ensure such compliance, but will also seek any damages, including attorneys' fees, arising from Wal–Mart's refusal to comply with the terms of the [St. Paul Lease] and REA." The last correspondence included in the parties' briefs is dated June 23, 2004 and was sent by Wal–Mart's bankruptcy counsel to DDR's counsel. The June 23 letter reiterated Wal–Mart's previous arguments, including its contention that DDR is precluded from complaining about the grocery sales because although DDR knew that such sales were part of Wal–Mart's "typical retail operations," it failed to object to the entry of the Assignment Order.

To date neither party has commenced a complaint to resolve their dispute. On July 14, 2004, DDR filed this Motion asking the court to clarify that the Assignment Order authorized the assignment *cum onere* and thus did not eliminate the use restrictions in the St. Paul Lease and the REA. Moreover, DDR requests the court to explain that none of the provisions of the Assignment Order, most particularly subparagraph (*l*) quoted above, should be construed to negate the REA use provisions so as to effectively give Wal–Mart *carte blanche* on what kind of groceries it can sell in the Former Kmart Store and how much of the store space can be devoted to its sale of groceries.

In response to the Motion, Wal–Mart argues that the Assignment Order unambiguously authorized Wal–Mart to use the Former Kmart Store in a manner consistent with its "typical retail operations," which include selling the types of groceries it is currently selling at the store. Wal–Mart further contends that because the Assignment Order is now final and non-appealable, DDR is barred by *res judicata* from revisiting the issues, such as the purported elimination of the use restrictions, that were necessarily decided against DDR with the entry of the Assignment Order.

At the initial oral arguments on this matter, the court *sua sponte* raised the issue of whether it has subject matter jurisdiction over a motion brought more than a year after the entry of the Confirmation Order and the Effective Date of the Plan involving a dispute between a former Kmart landlord and a third-party assignee of a Former Kmart Store. The court asked the parties to provide supplemental briefs on the jurisdiction issue. The court also requested that the parties address whether the Motion seeks an advi-

sory opinion given that the dispute thus far has been limited to the arena of competing correspondence.

## DISCUSSION

### Bankruptcy Subject Matter Jurisdiction

 A bankruptcy court must determine as a threshold matter whether it has subject matter jurisdiction over a proceeding. *See In re Federated Dept. Stores Inc.,* 240 B.R. 711, 716 (Bankr.S.D.Ohio 1999). Subject matter jurisdiction is generally defined as "the court's authority to hear a given type of case." *U.S. v. Morton,* 467 U.S. 822, 828, 104 S.Ct. 2769, 2773, 81 L.Ed.2d 680 (1984). "The jurisdiction of bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute." *Celotex Corp. v. Edwards,* 514 U.S. 300, 307, 115 S.Ct. 1493, 1498, 131 L.Ed.2d 403 (1995). Section 1334(b) of title 28 of the United States Code is the statutory source of bankruptcy jurisdiction and is thus the starting point for the bankruptcy judge to ascertain whether jurisdiction exists. *In re Cary Metal Products, Inc.,* 152 B.R. 927, 930 (Bankr.N.D.Ill.1993), *aff'd, Zerand–Bernal Group, Inc. v. Cox,* 23 F.3d 159, 161 (7th Cir.1994) (*citing In re Spaulding & Co.,* 131 B.R. 84 (N.D.Ill.1990)).

Section 1334 gives district courts original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11. *Id.*

Bankruptcy judges "constitute a unit of the district court," 28 U.S.C. § 151, and the district court may refer to them "any or all proceedings arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 157(a). The jurisdiction of the bankruptcy courts is thus "derivative" because it flows from the statutory grant of jurisdiction to the district courts. To summarize, this jurisdiction includes the power to adjudicate proceedings "arising in," "arising under," or "related to" a case under title 11.

*In the Matter of FedPak Systems, Inc.,* 80 F.3d 207, 213 (7th Cir.1996) (citations omitted). The district courts in this district have referred proceedings "arising under," "arising in," or "related to" a case under title 11 to bankruptcy judges. *See* Internal Operating Procedures of the Northern District of Illinois 15(a).

 "Arising under" jurisdiction encompasses causes or actions "created or determined by a statutory provision of title 11." *Cary Metal,* 152 B.R. at 931. " 'Arising in' jurisdiction encompasses issues relating to administration of bankruptcy matters that arise only in bankruptcy cases." *In re Schwinn Bicycle Co.,* 210 B.R. 747, 754 (Bankr.N.D.Ill.1997), *aff'd* 217 B.R. 790 (N.D.Ill.1997). So, while a proceeding may not arise under a specific Code section, it may arise in the case if it "would have no practical existence but for the bankruptcy." *In re Conseco, Inc.,* 305 B.R. 281, 285 (Bankr.N.D.Ill.2004) (*citing A.H. Robins Co., Inc.,* 182 B.R. 128 (Bankr.E.D.Va.1995)).

 The Seventh Circuit has held that "[a] case is 'related' to a bankruptcy when the dispute 'affects the amount of property for distribution [i.e., the debtor's estate] or the allocation of property among creditors." *FedPak,* 80 F.3d at 213–14. The Court further noted that,

[w]e have interpreted 'related to' jurisdiction narrowly "out of respect for Article III ... as well as to prevent the expansion of federal jurisdiction over disputes that are best resolved by state courts." *Home Ins. Co. v. Cooper & Cooper, Ltd.,* 889 F.2d 746, 749 (7th Cir.1989); *see also In re Kubly,* 818 F.2d 643, 645 (7th Cir.1987) (the "limited

jurisdiction" of the bankruptcy court "may not be enlarged by the judiciary because the judge believes it wise to resolve the dispute."). Additionally, we believe that common sense cautions against an open-ended interpretation of "related to" statutory language "in a universe where everything is related to everything else." Gerald T. Dunne, *The Bottomless Pit of Bankruptcy Jurisdiction*, 112 Banking L.J. 957 (Nov.-Dec. 1995).

*Id.* at 214.

## Subject Matter Jurisdiction After Plan Confirmation in a Chapter 11 Case

Chapter 11 cases normally involve the restructuring or reorganization of debt through the proposal and confirmation of a plan of reorganization. *See In re Hall,* 304 F.3d 743, 747 (7th Cir.2002). The chapter 11 case presents a concern regarding the extent of the jurisdiction of the bankruptcy court in the period after confirmation of the plan but prior to closing of the chapter 11 case, which may span months or even years.

■ There is no express statutory provision providing for a change in the nature of subject matter jurisdiction after plan confirmation. Section 1334 of title 28 is still the operative jurisdictional statute after confirmation and its broad language is unchanged. The Seventh Circuit in *Zerand–Bernal Group, Inc. v. Cox,* observed, however, that while the language of section 1334(b) is broad enough to encompass matters such as the post-confirmation injunction sought in that case, the section should not be read so broadly. 23 F.3d 159, 161 (7th Cir.1994). Rather, the section should be construed in light of the purposes of its enactment. *Id.* After confirmation of the plan, the purpose of a bankruptcy case, *i.e.,* dealing efficiently and expeditiously with all matters connected with the bankruptcy estate, is diminished. The diminishment of the purpose effectively contracts the 1334 jurisdiction in the post-confirmation period. Indeed, bankruptcy subject matter jurisdiction following confirmation of a chapter 11 plan has been described as "sharply reduced," *In re Spiers Graff Spiers,* 190 B.R. 1001, 1007 (Bankr.N.D.Ill.1996) (*citing Pettibone Corp. v. Easley,* 935 F.2d 120, 122 (7th Cir.1991)), and "limited" *Schwinn Bicycle,* 210 B.R. at 754–55.

■ This does not mean that there is no post-confirmation bankruptcy jurisdiction and the functions of the bankruptcy court are at an absolute end. Rather, the bankruptcy court retains jurisdiction to protect the confirmation order, prevent interference with the execution of the plan, and otherwise aid in the plan's operation. *Cary Metal,* 152 B.R. at 932. A number of Code provisions and Rules give bankruptcy courts authority to exercise that retained jurisdiction and are also indicative of the narrowed scope of post-confirmation jurisdiction. *See In re Kewanee Boiler Corp.,* 198 B.R. 519, 525 (Bankr.N.D.Ill. 1996) ("[w]hether emanating from the general power of courts to enforce their decrees ... or from specific bankruptcy code sections ... there exists a residue, albeit limited, of court authority over a confirmed plan chapter 11 case.")

One such specific Code section is 1142(b), which empowers a court to direct the debtor and any other necessary party to perform acts "necessary for the consummation of the plan." 11 U.S.C. § 1142(b). This court observed in *Cary Metal* that the literal language of section 1142(b) "provides that particular point-in-time when post-confirmation jurisdiction ceases, the point at which a creditor's action will not affect the administration of the plan." 152 B.R. at 931–32.

Another source of post-confirmation authority is found at Federal Bankruptcy Rule 3020(d), which provides: "Notwithstanding the entry of the order of confirmation, the court may issue any other order necessary to administer the estate." Finally, section 105(a) of the Code empowers bankruptcy judges to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Code and to *sua sponte* take any action or make any determination "necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

Again, however, a bankruptcy court's ability to invoke the powers given to it is limited to take only those actions that aid in its jurisdiction. *See Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988); *In re Sybaris Clubs Intern., Inc.*, 189 B.R. 152, 156 (Bankr.N.D.Ill.1995). As noted above, jurisdiction is reduced after plan confirmation. Accordingly, the exercise of powers, whether under sections 105(a) or 1142(b) or Bankruptcy Rule 3020(d), should only be undertaken to "ensure that reorganization plans are implemented ... and to protect estate assets devoted to implement the confirmed Plan." *Schwinn Bicycle*, 210 B.R. at 754 (citations omitted).

Summarizing subject matter jurisdiction after plan confirmation, at least one conclusion can be reached. There is no bankruptcy jurisdiction over a post-confirmation dispute between non-debtor parties that concerns assets that are no longer property of the estate, has no effect on the estate and does not implicate the integrity or affect the implementation of the plan.

Both parties argue, however, that the court retains jurisdiction to interpret its orders into the post-confirmation period without qualification. Wal–Mart relies on *In re Petrie Retail, Inc.*, 304 F.3d 223, 230 (2nd Cir.2002) and *In re Cedar Chemical Corp.*, 294 B.R. 224, 229 (Bankr.S.D.N.Y. 2003) for its argument that confirmation has no effect on the court's jurisdiction to interpret its own orders. This court is not entirely convinced that reliance on those cases for that argument is well placed. First, *Petrie Retail* involved a motion to enforce an injunction contained in a sale order as well as the discharge injunction in the plan of reorganization. Moreover, the dispute impacted consummation of the plan in that case. Indeed, the Second Circuit referred to the motion as the "Plan Consummation Motion." *Petrie Retail* thus involved more than a post-confirmation request for interpretation of a pre-confirmation order.

*Cedar Chemical*, which relies on *Petrie Retail*, makes no mention of whether a plan was confirmed in that case. Moreover, *Cedar Chemical* held that the court had core jurisdiction over a request to interpret an order even if the dispute is between non-debtors and the outcome had no effect on the estate. The dismissal of the effect on the estate analysis, at least in the post-confirmation period, as irrelevant appears antithetical to the law in this circuit. *See, Conseco*, 305 B.R. at 283 (*citing In re FedPak Sys., Inc.*, 80 F.3d 207, 214 (7th Cir.1996), for the proposition "that the bankruptcy court did not have jurisdiction to interpret its own order when resolution of the dispute would not affect the amount of assets available for distribution to creditors of the estate.").

**Is DDR's Motion within this Court's post-confirmation subject matter jurisdiction?**

In this matter, the court concludes that it does not have subject matter jurisdiction over this Motion. The post-confirmation dispute between these two non-

debtor parties involves the interpretation of a prior order of this court, *i.e.*, the Assignment Order and its possible preclusive effect. There is no apparent or urged need to interpret the Assignment Order to protect an estate asset "devoted" to the Plan. The Former Kmart Store is no longer part of the estate and serves no role in the implementation of the Plan. In addition, this court would not invoke the power to declare the preclusive effect of the Assignment Order given that such an analysis hardly appears necessary to ensure the implementation of the Plan. Moreover, as pointed out by the Seventh Circuit in *Pettibone*, the *res judicata* effect of an order entered in the first case is usually for the judge presiding in the second case to decide. 935 F.2d at 123.

Neither party has sufficiently demonstrated that this court's interpretation of the Assignment Order or a determination of its preclusive effect would impact the amount of property available for distribution to or the allocation of property among Kmart's creditors. There is what can only be characterized as speculation offered by Wal–Mart that if the court were to clarify the Assignment Order unfavorably to Wal–Mart's position, it may be forced to file an action to rescind the sale. Wal–Mart acknowledges that such a rescission suit would be brought not against Kmart, but the new firm that exists post-confirmation, which the court will refer to as Reorganized Kmart. Consequently, Wal–Mart recognizes that the potential damages from such an action will not directly impact the creditors of Kmart's estate, many of whom received stock in Reorganized Kmart in exchange for their allowed claims pursuant to the Plan. The action may, however, conceivably impact the value of the stock. Wal–Mart contends that this potential indirect negative impact on the stock value, constitutes a sufficient effect to confer "related to" jurisdiction. Wal–Mart makes no attempt to estimate the likelihood of success of such an action or quantify the decrease in stock value if Reorganized Kmart were required to rescind the sale. For its part, Kmart states that the "outcome of the DDR v. Wal–Mart dispute will not directly affect the value of Kmart stock distributed to its creditors." Kmart's Supplemental Pleading Addressing this Court's Post–Confirmation Jurisdiction to Adjudicate the Motion of DDR MDT Midway Marketplace LLC to Clarify this Court's April 15, 2003 Order Authorizing Assumption and Assignment of Certain Property to Wal–Mart, p. 5: ¶ 7.

DDR states that "it is not in a position to determine what Wal–Mart's remedies could be against Kmart and what effect, if any, there would be on the distribution to Kmart's creditors under the Plan." Supplemental Brief of DDR MDT Midway Marketplace LLC in Support of its Motion to Clarify this Court's April 15, 2003 Order Authorizing Assumption and Assignment of Certain Property to Wal–Mart Appellant (*sic*), p. 5. Rather, DDR "is simply asking this Court to clarify what the language in its own Order meant so that it can stop Wal–Mart from misusing this Court's Order." *Id.* at 4. That request is enough, according to DDR, to impart jurisdiction, even though it acknowledges that "any affirmative relief it would seek against Wal–Mart would be litigated in the appropriate forum, namely state court." *Id.*

The mere possibility of a rescission action may be insufficient to establish "relatedness." *See Zerand–Bernal*, 23 F.3d at 159. In *Zerand–Bernal*, the subject sale was the premise of the plan and the adversary complaint that threatened the rescission of the sale, and thus the undoing of the plan, was filed after the expiration of the 180–day deadline to revoke a plan. To the Court therefore, "the threatened rescission is no threat at all." *Id.* The Court

observed, however, that it was an open question as to whether a threatened suit to rescind a bankruptcy sale that was *not* part of a plan could confer "related" jurisdiction and cited to competing opinions on that point. *Id.* (*citing Pacor, Inc. v. Higgins,* 743 F.2d 984, 994–96 (3rd Cir.1984); *In re G.S.F. Corp.,* 938 F.2d 1467, 1474–76 (1st Cir.1991);, *In re Wolverine Radio Co.,* 930 F.2d at 1142–43).

Here, the assignment of the St. Paul Lease was approved before the entry of the Confirmation Order and was not incorporated into the Plan. The assignment was not by itself an integral aspect of the Plan and did not form the cornerstone of the Kmart reorganization efforts. There is no suggestion that the Plan is in jeopardy. Indeed, the only asserted impact on the Kmart creditors is a remote possibility of a decrease in stock value. Moreover, the possible reduced stock value to some extent assumes that Wal–Mart will be successful on the rescission lawsuit. Under all of these circumstances, there is too tenuous a thread of "relatedness" to the estate. *See, Schwinn Bicycle Co.,* 210 B.R. at 756.[2]

**Advisory Opinion**

■ In this matter, the fact that the parties have not filed a formal complaint in this or any other court raises another jurisdictional concern about the Motion. Specifically, the Motion may not present a real case or controversy ripe for consideration.

In a recent Sixth Circuit Bankruptcy Appellate panel opinion, the purchaser of a chapter 11 debtor's assets filed an adversary complaint with the bankruptcy court asking the court to determine that certain language in a bankruptcy sale order would prevent an account obligor from raising a defense in a future collection action. *In re Buckeye Steel Castings Co. Inc.,* 306 B.R. 186, 188 (6th Cir.BAP2004). In that case, the sale order authorized the debtor to sell accounts receivable and enjoined all persons from taking any action against the purchaser to recover claims they may have had against the debtor. After the sale was closed, the purchaser made a written demand to recover an account receivable. The obligor on the account indicated, presumably in response to the demand letter, that it would seek to setoff against its liability on the account a claim that the obligor held against the debtor. Before any lawsuit was filed, however, the purchaser filed the adversary complaint, asking the bankruptcy court to declare up front that the attempted setoff is barred by the terms of the sale order. The bankruptcy court dismissed the complaint for lack of jurisdiction because the issue was not ripe.

On appeal, the Bankruptcy Appellate Panel affirmed. In reaching its decision, the Panel explained the concept of ripeness;

> The power of federal courts extends only to cases and controversies, U.S. Const. art. III, § 2, cl. 1, and this has been interpreted to mean that to be cognizable a federal court, a suit 'must be definite and concrete, touching the legal relations of parties having adverse

---

**2.** Wal–Mart urges the court to analogize this situation to those cases that hold a potential positive impact on stock value constitutes a benefit for purposes of a trustee's ability to bring an avoidance recovery action brought pursuant to section 550 of the Code. *See In re P.A. Bergner & Co.,* 140 F.3d 1111, 1118 (7th Cir.1998), *cert. denied* 525 U.S. 964, 119 S.Ct. 409, 142 L.Ed.2d 332 (1998) and *In re Kmart* *Corp.,* 310 B.R. 107 (Bankr.N.D.Ill.2004). Those cases, however, were not decided on the issue of subject matter jurisdiction. Rather, they arose in the context of an affirmative defense brought by preference defendants against a trustee's statutory recovery action. The court considers the analogy not particularly persuasive.

legal interests. \* \* \* It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, *as distinguished from an opinion advising what the law should be upon a hypothetical state of facts.'*

*Buckeye Steel,* 306 B.R. at 188 (6th Cir. BAP 2004) (*quoting Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (emphasis in original)). The Panel held that,

> [t]he bankruptcy court's jurisdiction was thus invoked by CSC, a mere buyer of estate assets, in order for the court to give its opinion about whether a not-yet-raised defense to a not-yet-filed collection action in some other court might be something other than a recoupment. That issue is not ripe for adjudication upon hypothetical facts of a hypothetical case.

*Id.* at 188–89. To the Panel, the purchaser was attempting to gain the upper hand over the obligor by in essence preemptively attacking the anticipated defense so the obligor would be prevented or, at least, dissuaded from raising it in a future lawsuit.

A bankruptcy court in this district summarized the circumstances when an opinion is advisory,

> An advisory opinion results if the court resolves a question of law that is not presented by the facts of the case. *In re Chi., Rock Island & Pac. R.R. Co.,* 772 F.2d 299, 303 (7th Cir.1985) (finding that a court can decide "only the case before, it, and can not render advisory opinions disposing of other issues not presented for decision."). Likewise, a court's opinion on hypothetical statutes or "dubious constitutional principles ... would be difficult to characterize as anything but advisory." *United States Nat'l Bank of Or.,* 508 U.S. at 447, 113 S.Ct. 2173, 124 L.Ed.2d 402. Further, a

decision that cannot affect the legal rights of the parties is an impermissible advisory opinion, as are opinions on abstract legal questions. *See, e.g., In re Shondel,* 950 F.2d 1301, 1309 (7th Cir. 1991); *United States v. Peters,* 754 F.2d 753, 757 (7th Cir.1985). Finally, "*[a] dispute must have ripened into a legal case before a federal court can act; the case must not lie merely in the future."* *Jones v. Griffith,* 870 F.2d 1363, 1366 (7th Cir.1989).

*In re Outboard Marine Corp.,* 304 B.R. 844, 859–60 (Bankr.N.D.Ill.2004) (emphasis added). In the *Outboard Marine* case, a bank argued that a manufacturer's summary judgment motion seeking a declaration that it had a valid, first priority lien in certain equipment sought an advisory opinion. The court disagreed, finding that the motion was in the nature of a request for a declaratory judgment. The court noted that "[t]here is little doubt that [the manufacturer's] suit is 'an honest and actual antagonistic assertion of rights,' that 'valuable legal rights ... [will] be directly affected to a specific and substantial degree,' and that, accordingly, this Court has before it a real case or controversy." *Id.* (*citing United States Nat'l Bank of Or.,* 508 U.S. at 446, 113 S.Ct. 2173, 124 L.Ed.2d 402). The *Outboard* court's conclusion is supported by the fact that the summary judgment motion was brought in response to an adversary complaint pursuant to Bankruptcy Rule 7001(2) to determine the relative priority of liens in an estate asset. A ruling on the summary judgment motion could establish the rights of those litigants in estate property and dispose of a pending lawsuit.

Here, there is no complaint for a declaration of competing interests in estate property. As noted earlier, there is no estate property at issue here. DDR admits that it is not seeking affirmative relief from this court but plans on bringing a complaint against Wal–Mart in another

court. It is reasonable to surmise that DDR is more likely to bring its future plans to sue Wal–Mart in another court to fruition if this court were to interpret the Assignment Order in DDR's favor. In any event, this court is concerned it is being put in the position of rendering advice to a future court on how to view the relative strengths of the positions of the parties before that court. This court also notes that if it were to find at Wal–Mart's urging that DDR is barred by *res judicata* from raising certain arguments, this court would be usurping a function usually reserved for the second court in the context of adjudicating an affirmative defense.

## CONCLUSION

For the foregoing reasons, this court concludes that it lacks subject matter jurisdiction over the Motion. The court further concludes that it lacks jurisdiction over the Motion which asks for a ruling on an issue not ripe for adjudication. Accordingly, the Motion is denied.